## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

| | |
|---|---|
| JASON BROOKINS,       ) | |
|       ) | |
|    Plaintiff,       ) | |
|       ) | |
|    v.       ) | Civil Action No. 2:17-cv-60-KS-MTP |
| LAWRENCE COUNTY SCHOOL    ) | |
| DISTRICT; TAMMY FAIRBURN, in    ) | |
| both her official and individual capacity;    ) | JURY TRIAL DEMANDED |
| DARRYL TURNER, in both his    ) | |
| individual and official capacity and JOHN    ) | |
| DOES (1-10)       ) | |
|       ) | |
|    Defendants.       ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COMES NOW, the Plaintiff, Jason Brookins, by and through counsel, and files this, his Response to Defendants' Motion for Summary Judgment and would show unto the Honorable Court as follows:

### INTRODUCTION

Defendants failed to show that it is entitled to judgment as a matter of law in accordance with Rule 56. It was as though no discovery was taken. Defendants hardly attempted to negate any of the essential elements upon which Plaintiff, Jason Brookins, has the burden of proof at trial. Instead, Defendants relied on the "no evidence" approach that relied primarily on conjecture and assertions that Brookins is unable to present this Court with any triable fact issues. But in doing so, Defendants turned a blind eye to the evidence that contradicted their defense, including that which was taken during Brookins' deposition and administrative hearing. Despite Defendants' approach, Plaintiff's claims should proceed to

trial based on the applicable standard.  As this Court will see, Plaintiff can clearly show that several triable issues exists; thus Defendants' motion should be denied.

RELEVANT FACTS

The Background and Spark Plug

Throughout Plaintiff's tenure with the District, Plaintiff witnessed African-American members of the community and African American teachers both complain to the Lawrence County School Board ("LCSD"), Principal Darryl Turner, and to Fairburn about the racial discrimination that persists against African-American teachers' as well as the racial discrimination against African-American students in LCSD without any steps taken to prevent this conduct. (Ex 1).  Said complaints were also made to the Lawrence County School Board, Principal Darryl Turner, and to Fairburn about the repercussions that African Americans suffered after complaining about these inequities.  Id.  Eventually, Plaintiff also provided such notice.  Id.  Despite these complaints, Fairburn and LCSD currently refuse to take any steps to address these concerns or even abide by a consent decree ordered by the United States District Court for the Southern District of Mississippi Hattiesburg Division to hire and retain black educators. Id.  Also, during Fairburn's tenure, Plaintiff witnessed the Lawrence County School Board repeatedly ratify or "rubber stamp" Fairburn's discriminatory and retaliatory actions launched against black teachers who were falsely accused of misconduct in order to encourage their resignations.  (Id; Ex. 2). When this method was unsuccessful, Plaintiff witnessed the district' fire black teachers out right based on racially motivated charges that arose under Fairburn.  Id.

On or about September 2015, Mr. Brookins (her husband) instituted a separate complaint to Lawrence County High School's Principal Daryl Turner and Superintendent Tammy Fairburn

about the discriminatory practices of the LCSD.  Id.  Mr. Brookins informed that the district's hiring practices were discriminatory as was his concern as regards to the administration of punishment towards his African-American godson.  Id.  No steps were taken by any member of LCSD to institute any changes or allay his concerns.  Id.

Shortly thereafter, on or about October 2, 2015, Brookins was accused by three students with known disciplinary problems who conspired to make specious claims that Brookins had provided these students with a laptop containing obscene images.  Id.

Though the story had blatant inconsistencies, Fairburn who held ultimate policy making authority with respect to, *inter alia*, teacher discipline, along with her subordinates Twala Oakes, and Darryl Turner, collectively seized on the opportunity to lead another campaign of racial harassment, retaliation, and discrimination against this African American teacher who complained about the widespread discriminatory policies and practices within the district.  Id. Fairburn, Oakes, and Turner knew or should have known the allegations were untrue when they were made and purposely avoided documenting exculpatory evidence in direct contrast to their approach with Caucasian educators accused of misconduct.  Id.

Specifically, on or about October 5, 2015, the Lawrence County School District (LCSD) placed Kenneth Brookins on paid administrative leave (HOR at 36) and suspended him on or about October 15th and 16th which led to a loss of benefits.  (41-2-27; Ex 1).  According to LCSD, Brookins was suspended for: 1) Failure to protect students from having access to obscene material in violation of Standard 4.2.6; 2) Violating the Internet Acceptable Use Policy for LCSD; and 3) Failure to properly supervise students during the school day, as well as verbal intimidation in violation of 4.1.3.  (Id. at 12-13).  Though he was not allowed to return to work until October 19, 2015 so that an investigation could be conducted during this time frame, no such investigation occurred. (41-2-(23-26; 29; Id).   This had the obvious effect of humiliating

Brookins in the small community.  (Id; Ex 1).

Defendants' Reaction and Bogus Charges Prior to Resignation

With respect to failure to protect students from obscene material and violation of the internet policy by providing *personal* iPad access, the charges were baseless. (emphasis added).  Fairburn admitted that she had no evidence regarding what was on the iPad (Vol VI at 86); the district had provided the iPad access so it was not a personal ipad as charged (Vol VI at 87)(Vol VI at 94-95); Oakes admitted no proof that the device was even internet capable or accessed despite the charge (Vol II at 95); and Fairburn admitted it was baseless and a waste of taxpayer money to have charged him for these violations without enough information to support it (Vol V at 72).  Also, Principal Turner admitted they knew there was no obscene material on the ipad despite standing behind the suspension.  (Doc. 41-2-29).  Just as importantly, no student accused Mr. Brookins of any of the behavior found in that section which required an inappropriate written, verbal, electronic, physical or romantic relationship with the student.  (Vol 2 at 105).

With respect to the charge of failure to supervise, this charge was baseless as well. The LCSD admitted a violation under Standard 1.2.5 required failure to provide appropriate supervision *and reasonable disciplinary actions* (emphasis added).  (Vol 5 at 56-57). Fairburn admitted that her sole basis for the charge was based on the fact Brookins questioned students in the science lab though s she admitted that she didn't t know when this occurred nor the duration (Vol V at 102 -103).  More importantly, she admitted there was no evidence that supported her charge that Brookins violated this provision (Vol V at 58), and there was no precedent she could rely on from either the state or district that Brookins violated this provision (Vol 5 at 64) when he interviewed students in the science lab (Vol 5 at 52) regarding

4

rumors of his misconduct.  Id. at 75.  Beyond her own admissions that there was no factual support or administrative guidelines that supported her charge, the charged conflicted with the teacher's compliance with the district's directive that he protect the students from unnecessary embarrassment.  (Vol V at 79; 81). Brookins also explained the obvious conflict based on the district's past practices. (Ex. 1).  Although Fairburn admitted that her charges against Brookins were not grounded in policy, she tellingly admitted that she would receive rubberstamp support from the board anyway. (Vol 5 at 62).

With respect to the intimidation charge, Brookins allegedly violated Rule 4.2.6, and this too was belied by the district's own guidelines.  Brookins was charged with punishment for intimidation under this provision and a separate provision although Brookins interviewed students in the admittedly same fashion as she and Turner (both Caucasians).  (Vol 2 at 105). Neither of them were ever under investigation or leave, however. Id.  In fact, once the district instructed Brookins not to question the students, she admitted there is no evidence that he did not comply. (Vol 2 at 115-116).   Conversely, Caucasian teacher Williams allegedly pushed a student (Vol 2 at 150) according to a student and parents, but was never placed on leave even during the investigation nor was he charged with intimidation.   Then there was Caucasian teacher McKinnon who had pending criminal charges for assaulting a student based on testimony from parent and teacher (Vol 2 at 157-160) but she was never placed on leave or suspended and the investigation was concluded in her favor even prior to the resolution of her criminal case.  Reports were made against Caucasian teacher Sandifer who said to a student that he was acting like a "fucking kindergartener" and that she allowed students to watch the sexually explicit miniseries "Grey's Anatomy" in class.  To date there has been no placement of this teacher on administrative leave or suspension.  (Vol VI at 24). In sum, Fairburn admitted that several white teachers were accused of intimidation by parents

and students, but none were ever charged.  (Vol VI at 118). Yet Brookins, who was simply attempting to get to the bottom of a rumor in admittedly the same fashion as his other LCSD personnel, was charged and suspended for intimidation.  This occurred although LCSD's administrator admitted that he was allowed to ask the very questions for which he was punished.  (Vol 2 at 117).  Just as troubling, there were no reports of physical contact, foul language, or even yelling by Brookins towards any student.

With respect to failure to report, Defendants engaged in a witch hunt and tried to invent a completely imagined duty to report not grounded in any rules.  But Fairburn justified Caucasian teacher Sandifer's failure to report screaming "fucking crybabies" at students by claiming that it was discretionary to report the information (Vol 5 at 134).  Just as importantly, Fairburn once again admitted there was no policy that required Brookins to report anything related to student rumors regarding inappropriate videos on a school authorized ipad against him. (Vol 5 at 132-133).  Indeed, she admitted Brookins had pure discretion to report on this issue, id, and LCSD again admitted that the failing report rumors made against him were baseless.  (Vol 5 at 132).  Twalah Oakes, a LCSD administrator, initially and actually admitted that the investigation against Brookins was designed to find punishment against Brookins (41-2-29; (Vol II at pg 20 line 10-14).

Additional Spark Plug and Retaliation

Ultimately, the campaign of harassment didn't end with the baseless suspension with a loss of benefits as Brookins continued to engage in protected activity opposing the discriminatory practices of the LCSD. As a result, the district continued its campaign to quiet Brookins upon his return. When Brookins returned on October 19, he reiterated his concerns to Turner regarding the discriminatory practices of the district shortly thereafter.  (41-2-30-32).

Subsequent to this conversation with Turner, Fairburn, Oakes, he reiterated the same concerns for community and his son and Turner cornered Plaintiff.  Id; Ex 1.  In response, Oakes threw paper at him and the administrators postured with a "show of force." Id. at 32. Indeed, Fairburn told him that his entire professional career was in jeopardy unless he keep quiet.  According to Fairburn, "if you get back to the school and we don't hear anything out of you" "ill be nice to you" and if not, "you might not be able to get a teaching job.' (41-2-28).  But Fairburn wasn't done.  Subsequent to that meeting, Brookins claimed he was clearly threatened as Fairburn directed a subordinate to follow Brookins home, uninvited, to confiscate the ipad.  41-2-33.  It was the African-American administrator Collins who had to stop Quinn from following Brookins home. Id.

On or about January 2016, these same defendants turned an additional blind eye to the couple's complaints that their godson (who they were raising) had allegedly sat in a segregated classroom during Mrs. Green's (Caucasian teacher) instruction with "white kids in the front and…all the black kids in the back. " They too ignored that he was unfairly discriminated against with regards to punishment as compared to a Caucasian child who committed a more egregious offense ( Ex 1; 41-2-37). Based on district procedures LCSD was on notice of these activities. Ex 1.  After his minor was transferred to Caucasian teacher Sandifer, she allowed the class to watch sexually explicit content on a program called Grey's Anatomy.  During one episode, the doctors "were having a contest who could give the most blow jobs, if they could loose their virginity and stuff, just inappropriate stuff to be at school."  Brookins complained about his son's exposure to this, but again nothing happened.  (41-2-38).   In fact, the Caucasian teacher violated FECRA and a code of ethics as she spread stories within the school about their godson whose parents were undergoing a divorce. Turner admitted to this but again did nothing.  Id. Not stopping there, Mr. Brookins stopped receiving disciplinary support though it was necessary

to do his job. (Ex. 1)  Brookins was also denied travel, refused access to his employee records, interrogated about his legal representation, frequented with interruptions and embarrassment during his instructional day, denied internet access, prevented from attending conferences, suffered undeterred student harassment, forced to pay out of pocket for expenses, and other retaliation.  (Ex. 1).  Moreover, his suspension led to a loss of pay as he was forced to expend personal days.  (Ex. 1).   Around May 2016, Plaintiff's wife, who was also an employee who reported under Fairburn and Oakes, was attacked by Oakes who ripped paper in Mrs. Brookins face and began screaming at her.  (41-2-34)(Ex. 1).  Based on the foregoing attempts to dissuade him from speaking out about discrimination, Mr. Brookins testified that he felt defenseless, "it was the only job", "I had two kids" and "they needed to eat."  (41-2-34).  Plaintiff felt bullied Id, and ultimately felt compelled to resign.  He had lost nearly forty pounds during the relevant period which included a work environment where his superintendent threatened his entire livelihood beyond working as a teacher at LCSD based on her ability to report a bogus charge involving indecency to a child to the State if he stepped out of line. (Ex. 1).

Policymakers and the Board's Awareness

Notably, there were numerous other African-American teachers who were victimized by the district during Tammy Fairburn and her subordinate, Twalah Oakes' tenure.  (41-2-35-37); Ex 1; Ex 2).   The district was aware of the discriminatory practices of these individual defendants as it had received repeated complaints and notices from both members of the community, teachers, and its own board members.  Id. Despite this knowledge, the board took no activity to curb any of the discrimination and retaliation. Id.   In fact, the board delegated almost all the actions described in this suit to the superintendent (Vol VI pg 30), including the administration of the school, discipline, scope of investigations, pay deductions, issuance of reprimands, negative reporting to the state, administrative leave, and allocation of funds. Ex 1;

Ex 2).  Principal Turner had policy making authority concerning terms and conditions of employment including disciplinary support related to maintaining a classroom environment conducive to learning and the initiation of investigations. Id.  The board in practice ratified the conduct of Fairburn with respect to ultimate employment decisions as well, however. Id. In fact, Fairburn directed the board to sustain the suspension of Plaintiff after it initially resisted. Id. And there were also instances were Fairburn demonstrated final policy making authority with respect to firing African-American teachers. (Ex 2).

<u>STANDARD OF REVIEW</u>

Federal Rule of Civil Procedure 56(a) requires that a court grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S. Ct. 2548 (citation omitted). In reviewing the evidence, factual controversies are to be resolved in favor of the  non- movant. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) *(en banc)*. When such contradictory facts exist, the Court may "not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). Rather, the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his or her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  "Although summary judgment is a useful device, it must be used cautiously or it

may lead to drastic and lethal results." *Murrell v. Bennett*, 615 F.2d 306, 309 (5th Cir. 1980).

## ARGUMENT

A.   Defendants have waived any affirmative defense of abstention and failed to show that abstention is proper

Defendants appear to have waived any defense based on abstention. Defendants failed to plead this defense, and failure to plead an affirmative defense results in waiver. *Henry v. First Nat. Bank of Clarksdale*, 595, F.2d 291. Furthermore, Defendants willfully submitted to the jurisdiction of this Court in litigating this matter. Generally, the pendency of an action in state court is no bar to proceedings concerning the same matter in the federal court having jurisdiction. See *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). Abstention is the exception not the rule. Id at 13.   Based on the principles outlined in *Younge*r and *Rocker Feldman*, Defendants wholly failed to present any basis as to why this Court should be deprived of jurisdiction at this late stage. Defendants failed to even articulate the underlying issues in that case and explain how they necessarily involve issues in this case. Indeed, Defendants simply conclude "Plaintiff was given a multi-day administrative hearing on his suspension, which, after he lost, he appealed to the Chancery Court." (Doc. 42 at 13). Defendants made no effort to explain how the pending outcome of the Chancery Court decision would make a bit of difference to the underlying issues involved in this case, the relief requested, or facts presented. Defendants failed to show or even argue that the same burdens of proof are at play, similar rules of evidence, or that the theories related to the board decision are even relevant to the instant matter. Defendants also failed to demonstrate that certain of the facts which support a constitutional violation before this Court were adequately developed or known to either the school board or the reviewing court.

10

Simply put, Defendants lengthy recitation of legal standards coupled with very little application to the relevant facts should be deemed insufficient to meet its burden to show that abstention is warranted at this very late stage.

   B.    Plaintiff satisfied the exhaustion requirements for the suspension and constructive discharge.

   Defendants dedicated very little ink in support of its contention that Plaintiffs racial discrimination claims must fail because Plaintiffs' failed to exhaust his administrative remedies with respect to his constructive discharge and two-day suspension. (Doc 42 at 14). Specifically, Defendants made a passing argument that his EEOC charge was two weeks late and he failed to amend his EEOC charge with respect to constructive discharge.  Id.

   Recognizing that most EEOC complaints are initiated *pro se*, this Circuit tends to engage in a fact-intensive analysis of the substance of Plaintiff's statement in the administrative charge rather than its label.  *Fellows v. Universal Restaurants, Inc*., 701 F.2d at 451.   The administrative charge is construed "liberally," and this liberality is accomplished by examining the scope of the EEOC investigation which can reasonably be expected to grow out of the charge.   Id.   The purpose of exhaustion is to put the employer on notice of the impending suit.  *E.E.O.C. v. Fry's Electronics, Inc*., 770 F. Supp. 2d 1168, 1172 (W.D. Wash 2011) (citing *Horton v. Jackson County Bd. of County Com'rs*., 343 F.3d 897, 899 (7th Cir. 2003)

   Here, although the district suspended Brookins on October 15-16, it equivocated on whether it would suspend him without pay at that time.  (Ex. 1).  In fact, it was not until during the hearing where Defendants also acknowledged the racially discriminatory nature of his suspension and Brookins suffered the loss of benefits associated with the same.  (SOF; Ex-1). Within days of learning of the District's stated basis, Plaintiff filed his charge which included

the pattern of admittedly racially disparate treatment as it was during the hearing (April 2016) where the district caused Plaintiff to be financially penalized for challenging the district's decision. Therefore, Plaintiff's EEOC charge was not untimely.   Furthermore, Plaintiff is entitled to the 300-day filing period under §200e-5(e).   *Urrutia v. Valero Energy Corp*., 841 F.2d 123, 126 (5th Cir. 1988)(300-day period for fling with the EEOC is available whether or not proceedings are timely instituted under state or local law).

Moreover, there are exceptions to exhaustion where (1) "the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination"' (2) where the complaint is one alleging retaliation by an employer against an employee for filing an EEOC charge; and 3) where the complaint alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge.   *Butts v. City of New York'Dept of Hous. Pres. & Dev*., 990 F.2d 1397, 1402-03 (2 Cir. 1993).     Here, Plaintiff's discharge is due, at least in part, to Defendants' retaliatory conduct, and most of the incidents Plaintiff cites as providing the basis for his constructive discharge claim were previously alleged in his EEOC complaints.   (Ex.1). Therefore, Plaintiff's EEO complaints prior to discharge should be deemed sufficient.  If this were not the case, this could dissuade an employee from filing EEO complaints and "could have the perverse result of promoting employer retaliation in order to impose further costs on plaintiffs and delay the filing of civil actions relating to the underlying acts of discrimination." *Butts*, 990 F.2d at 1402.   Moreover, the Court should find Plaintiff exhausted his administrative remedies because the EEOC did not close the file until 2017, long after Plaintiff had resigned and after Plaintiff had complained about the district's contact with his future employer.  (Ex. 1).

Notably, the EEOC decided that there were no violations, and any further amendment based on Plaintiff's resignation would have been futile.  The EEOC was already on notice of the incidents which led to the constructive discharge before issuing its ruling.  In this case, Plaintiff filed his EEOC charge April 20, 2016 and resigned in June 2016.  And the events which led to Plaintiff's resignation had already taken place.  As such, this serves as another basis to find that Plaintiff satisfied his exhaustion requirement.

      C.     Plaintiff's discrimination claims should survive

Defendants conceded that Plaintiff has met half of the requirements necessary in order to establish a prima facie case of discrimination, including Plaintiff is an African-American (member of a protected class) who was qualified for the position of teacher, and replaced by a Caucasian teacher.  Defendants contend that Plaintiff did not suffer an adverse employment action, thus Plaintiff's claim is barred.  While Defendants correctly announce the standard, they are wrong in its application.  "To establish a discrimination claim under Title VII or § 1981, a plaintiff must prove that he or she was subject to an 'adverse employment action'-a judicially-coined term referring to an employment decision that affects the terms and conditions of employment."  *Thompson v. City of Waco, Tex*. 764 F.3d 500, 503 (5th Cir. 2014). "[A]dverse employment actions consist of ultimate employment decisions such as hiring, firing, demoting, promoting, granting leave, and compensation."  Id.  Defendants argument is heavily based on the Plaintiff's deposition testimony where he stated that he was paid during the two-day suspension.  However, Plaintiff testified that his compensation was negatively impacted by Fairburn and ratified by the District because he was charged personal days directly related to the suspension. (Ex 1; 41-2-40).  Thus, Plaintiff's suspension which negatively impacted his compensation constituted an adverse action.

Not only was Plaintiff subject to the suspension without his full pay, he was constructively discharged. Here again, Defendants correctly cited the legal standard which proscribes that a "Plaintiff must show that a reasonable person in his shoes would have felt compelled to resign." *Woods. v. Delta Beverage Group, Inc*. 274 F.3d 295, 301 (5th Cir. 2001). And the factors for the courts to consider, include the following: (1) demotion; reduction in salary; (2) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement on terms that would make the employee worse off whether the offer was accepted or not." *Barrow v. New Orleans S.S. Ass'n*, 10 F.3d 292, 297 (5th Cir. 1994). This citation alone is not enough for summary judgment purposes however.

The Court should find that *Idom v. Nathcez-Adams School Dist*., is instructive. 115 F.Supp.3d 792 (S.D. Miss. 2015). In that case, the plaintiff claimed that she had resigned but suffered an adverse action based on an allegation of constructive discharge. Id. The court noted that Idom was not demoted, her salary was not reduced, job responsibilities were not reduced, nor was she reassigned to work under a younger supervisor. Ultimately, the court still concluded that a triable fact question was present with regard to constructive discharge because Idom alleged that she was reprimanded, subjected to unannounced visits, accused of being unprofessional, and humiliated based on her race. Id. This Plaintiff has presented far more evidence. And the Court should find that a reasonable employee would have felt compelled to resign if he were in Plaintiff's shoes.

Although Defendants' selectively cherry-picked quotes from Plaintiff's deposition favorable to its defense while ignoring those which contradicted its position, see *Malin v. Hospira*

*Inc.*, 2014 WL 389675, at *11(7th Cir. 2014)(disapproving the practice of repeatedly cherry picking isolated phrases from Plaintiffs' deposition and claiming the admissions doomed her case."), Plaintiff presented an array of evidence of discrimination.   The record evidence indicates that Fairburn turned a blind eye to the multiple incidents involving Caucasian teachers who were accused of physical assault against minors to the extent the police were involved, including Lydia Mckinnon; profane and abusive language directed at children by Candice Sandifer who called a student a "fucking crybaby/kindergartner" in the presence of an entire classroom (as well as showing sexual content to students); obscene videos played during school hours by Candice Sandifer (for most of the school year) (41-2-38); and student brutality by Danny Williamson with accompanying parent complaints.   There was no punishment by Fairburn or Turner with respect to those teachers.   (SOF).   The administrators made comments such as "we don't want to see you" and he was sent home from October 6-19 when the so-called investigation was ongoing. When he returned, he was assaulted by Twalah Oakes, with Fairburn present, and there was no evidence of any reprimand. (41-2-31)(this document was thrown at me by [Oakes]).   Fairburn also engaged in physically threatening behavior toward Plaintiff herself.   (41-2-31-32)(citing "it was threatening..it was a show of force" "she was increasing, moving forward in her chair towards me.") Beyond the formal reprimand, Plaintiff was also put on a job improvement plan with another reminder of being fired.   (41-2-29).  However, Fairburn admitted at the school board hearing around April 2016, that the decision to suspend was made before his statement was ever taken, and no investigation took place during the twelve days he was not allowed to return to school.  It also became known at that time that he was charged with violations that were not even consistent with the district's allegations; thus a reasonable jury could conclude that this was designed to humiliate Plaintiff (41-2-(23-26; 29)).   Despite record evidence which supports a

reasonable jury finding that Fairburn knew these were trumped up charges, she claimed that "these are Standard 4 charges, so that means I need to report these to the State.  If I report these to the State, they are probably going to take your license."  She added "if you get back to the school and we don't hear anything out of you, then maybe I might not report this…, if I report this, ….you might not be able to get a teaching job." "If you do anything else, we are going to have to let you go, fire you."  (41-2-28).  This was after the bogus performance improvement plan which stemmed from this incident as well.  (41-2-29).  During this time, Plaintiff had to seek psychological help due to the stress caused by Defendants.  (Ex. 1).

Importantly, Plaintiff witnessed Fairburn had unfettered power within the district to racially discriminate against minorities.  (Ex. 1).  Despite evidence upon which a reasonable jury could conclude that both Fairburn and the district knew of Plaintiff's innocence, Fairburn still demanded that the school board issue a ruling sanctioning her decision to suspend Plaintiff which led to Plaintiff's loss of benefits after the members questioned why this was necessary based on the fact Plaintiff had already issued his resignation.  (Ex. 1; Ex 2). To be sure, Plaintiff's ongoing medical treatment and subsequent resignation just weeks later is in conformity with the response a reasonable employee would make facing the ongoing racial harassment at LCSD.  Clearly, a reasonable employee would feel compelled to resign in the face of the aforementioned evidence as well as the threat of bogus charges that had both criminal and future employment implications being held over his head given these circumstances; an environment where Caucasians engaged in criminal conduct with impunity (against him as well); a sham investigation designed to humiliate Plaintiff;  loss of benefits due to race, a suspension which violated the district's own due process; open retaliation for complaining of racism within the district, threats to follow him home directed by Fairburn (although the employee was ultimately dissuaded by Plaintiff); lack

of disciplinary support (Ex. 1); failure to enforce bullying provisions (Ex. 1), disrespect of his classroom decorum by administrators and unreasonable demands (Ex. 1).

 Hostile Work Environment.

 Defendants are correct, in this Circuit, Plaintiff will have a hard time maintaining a racially hostile work environment claim.  Still, there doesn't appear to be any precedent in this Circuit that prevents a plaintiff from relying upon facially neutral incidents so long as a reasonable inference can be drawn that the conduct at issue is discriminatory based on the totality of the circumstances.  Based on the facts described, a reasonable fact-finder crediting Plaintiff's testimony could find that the harassment described was racially motivated and sufficiently severe or pervasive enough to alter the conditions of Plaintiff's employment and to create an abusive working environment.[1]   In order to establish a *prima facie* case of hostile work environment, an employee must raise a genuine dispute of material fact or prove: (1) that he belongs to a protected class; (2) he was subject to unwelcome harassment; (3) the harassment complained of was based on the protected characteristic; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action. *Ramsey,* 286 F.3d at 268; *Hernandez v. Yellow Transp., Inc.,* 670 F.3d 644, 651 (5th Cir.2012) (Title VII and Chapter 21). In *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), and *Burlington Industries,* 622*622 *Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), the Supreme Court modified this test with respect to cases in which the alleged harasser is a

---

[1]Defendants don't erroneously contend that any of the conduct relevant to Plaintiffs' limitation charge is untimely with respect to his hostile work environment claim perhaps recognizing that "as long as an employee files her complaint while at least one act which comprises the hostile work environment claim is still timely, 'the entire period of the hostile environment may be considered by a court for the purpose of determining liability." *Hartz v. Adm'rs of Tulane Educ. Fund*, 275 Fed.Appx. 281, 289 (5th Cir. 2008)(quoting *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002))

supervisor with immediate or higher authority over the harassed employee. In such cases, the employee need only meet the first four elements of the test. *See id.*

In the instant motion for summary judgment, Defendants move to dismiss this claim based on Fairburn's testimony that there is no evidence that she, Turner, Collins or Oakes ever used racially derogatory terms.  (Doc. 42 at 23).  Defendants also add that Plaintiffs failed to adduce proof that he was subjected to any racially tinged work place.  In essence, Defendants take issue with the third element that a reasonable jury could not find that the harassment suffered by Plaintiff was due to his race in the absence of racially derogatory terms.[2]   However, a reasonable jury could reach this conclusion.  In this case, Defendants hardly contested a majority of Plaintiffs' allegations that the district failed to enforce a federal consent decree under Superintendent Fairburn's tenure that is designed to increase the retention rate of African-American teachers (Complaint at 3-4), that the district quiets African-American teachers with threats to their livelihood; that Plaintiff's African-American son was racially discriminated against with no action being taken and despite complaining to the district during his tenure a teacher; he was subjected to a racially motivated sham investigation and  bogus charges while Caucasian teachers were engaging in far more egregious conduct with impunity,[3] and that his African-American wife was racially discriminated against and subsequently targeted by Defendants, including Fairburn. (SOF; Ex 1; (41-2-34)(explaining that after Oakes' ripped paper in wife's face)

Defendants contention that Plaintiff's hostile work environment claim depends on merely an allegation of snappiness is plainly misleading.   To the contrary, beyond the aforementioned allegations, the record evidence also revealed that Plaintiff was subjected to an environment

---

[2] Defendants issue argument regarding snappiness is irrelevant as Plaintiff's claim is not based on this allegation.
[3] Defendants contested this point.

where criminal and future employment implications were being held over his head;  a suspension which violated the district's own due process; open retaliation for complaining of racism within the district, threats to follow him home directed by Fairburn (although the employee was ultimately dissuaded by Plaintiff); lack of disciplinary support; failure to enforce bullying provisions; disrespect; unreasonable demands in order to give way for Caucasians to have an easier course load; medical treatment for severe anxiety; and threatened to be quiet or risk being fired.  Moreover, record evidence indicated that Fairburn disproportionately subjected black teachers to punishment and required the district to find punishment of Brookins was warranted. (SOF; Ex 1). To be actionable, the work environment must be "`both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" *Hernandez v. Yellow Transp., Inc*., 670 F.3d 644, 651 (5th Cir. 2012) (*quoting Faragher v. City of Boca Raton, 524 U.S. 775, 787, 118 S. Ct. 2275, 141 L. Ed.2d 662 (1998)*).  Whereas in order to determine whether an environment was objectively offensive, courts consider the totality of the circumstances, including the frequency of the conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance. *Faragher*, 524 U.S. at 787-88, 118 S. Ct. 2275.  The record evidence clearly supports a finding that Plaintiff was subjectively offended by Defendants' conduct.  (SOF).  Although many of the incidents are facially neutral in isolation, Plaintiff has presented enough factual basis for inferring discriminatory animus based the totality of the circumstances.  *Alfano*, 294 F.3d at 377 ("Facially neutral incidents may be included ... among the `totality of the circumstances' that courts consider in any hostile work environment claim ... [if there is some] basis for inferring that incidents sex-neutral on their face were in fact discriminatory.").

Pretext

Having established a prima facie case of discrimination, "Plaintiff can also adduce evidence that would permit a reasonable jury to find that [Defendants'] reasons for discharging them are a pretext, or that his race was a factor that motivated the adverse actions taken against him. Defendants' legitimate reasons offered were not its true reasons, but were a pretext for discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143 (2000) (quoting *Burdine,* 450 U.S. at 253). Notably, the trier of fact may still consider the evidence establishing the plaintiff[s'] prima facie case `and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.'" *Reeves,* 530 U.S. at 143 (quoting *Burdine,* 450 U.S. at 255 n.10); *Laxton v. Gap Inc*., 333 F.3d 572, 578 (5th Cir. 2003)(explaining plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence); and *Fabela v. Socorro Indep. Sch. Dist.,* 329 F.3d 409, 415 (5th Cir.2003)("statements or documents which show on its face that an improper criterion served as a basis-not necessarily the sole basis, but a basis-for the adverse employment action are direct evidence of discrimination.)[4]"

Defendants defend against Plaintiff's discrimination claims involving hostile work environment, constructive discharge, and loss of compensation on the sole basis that students reported seeing 1) inappropriate content on a personal ipad; 2) Plaintiff failed to report these rumors; 3) Plaintiff intimidated these minors by questioning them outside the presence of his classroom, and that 4) Plaintiff left to his classroom to do so. (Doc. 42 at 21-22). To be sure, a reasonable jury could both find that its reasons are pretextual and that his race was a factor that

---

[4] Defendants suggest that that a reasonable jury could only find that Plaintiff's resignation prohibits a finding of constructive discharge while acknowledging the authority upon which it relied has been abrogated by the Supreme Court. Without question, a reasonable jury could certainly find that Plaintiff was offered continued employment on terms less favorable than his former status as well as racially harassed.

motivated each of the aforementioned actions taken against him.  Indeed, a reasonable jury should find Defendants' explanation dicriminatory.  When lawyer conjecture is removed from the facts including hyperbole that Plaintiff "marched down" students, the reality is that the district claimed that Plaintiff, a teacher, was suspended for failing to report a rumor when there was no requirement whatsoever for him to do so, much less a time frame.  Indeed, such an action was in his sole discretion to determine if it warranted reporting and his manner, and timing of questioning was previously sanctioned by Fairburn. (Ex. 1).  Furthermore, the explanation that the district would claim that this teacher can't briefly question students outside the presence of their peers is just as discriminatory.  The state guidelines required that Plaintiff do so under those circumstances, order to reduce the likelihood of embarrassment.  (Ex. 1).  The district failed to mention that it drummed up additional charges in the suspension letter such as violating the internet policy by letting the student's use Plaintiff's personal ipad.  (41-2-28; Ex 1). But again, the ipad was actually issued by the district. (Ex. 1).  There was no report of internet usage either. (SOF; Ex 1).   Furthermore, Fairburn admitted that she had no idea the length of time, or when Plaintiff questioned these students though she had already decided to suspend him before receiving Plaintiff's version of events.  (SOF; Ex 1).  The district failed to find any evidence supporting these incredible accusations and principal Turner admitted they knew there was no obscene material on the ipad despite standing behind the suspension.  (Doc. 41-2-29).   To be sure, a reasonable jury could easily find that pretext exists.

Beyond the foregoing facts, there is additional record evidence whereby a jury could reject Defendants' justifications. For example, Fairburn led an investigation that her subordinate Twala Oakes admitted was limited to just finding information that would support a charge against Mr. Brookins. (Vol II at pg 20 line 10-14).  Despite the charges and suspension against Plaintiff, Fairburn turned a blind eye to Caucasian teacher Lydia Mckinnon's profane and abusive

language directed at children; Caucasian teacher Candice Sandifer who called a student a "fucking crybaby/kindergartner" in the presence of an entire classroom; Sandifer's open display of sexual nudity in video form to students throughout the school year; and the student brutality by Danny Williamson. (SOF).  Notably, Fairburn admitted that she had not reprimanded or suspended any white teachers for any of the charges levied against Plaintiff.  Fairburn admitted that charges that served as a basis for Plaintiff's suspension were belied by the evidence. (SOF). Despite these facts, Fairburn required that the district vote to sustain the suspension of Plaintiff as a member of the district's own board viewed the justifications were inconsistent and admitted African American teachers who opposed discrimination were targeted by Fairburn and the district. (Ex. 2).  In fact, the record evidence also shows Plaintiff was charged with violations in contravention of the district's own policies and procedure.  (SOF; Ex 1).  Again, a reasonable jury could easily reject Defendants' proffered business justifications and find Defendants' relied on the same as a pretext for discrimination.

     D.     Brookins Presents a triable fact dispute regarding Title VII retaliation

The Court should reject Defendants' attempt to dismiss Plaintiff's Title VII retaliation claim.  To make out a claim for retaliation, Plaintiff must show that he: 1) engaged in a protected activity; 2) an adverse employment action followed; and 3) there was a causal connection between the activity and the adverse action.  *Aryain v. Wal-Mart Stores Texas LP*, 535 F.3d 473, 484 (5th Cir. 2008).  In this context, employee opposition to discriminatory practices directed against a fellow employee may constitute activity protected activity.  See *Jones v. Flagship Int'l*, 793 F.2d 714, 727 (5th Cir. 1986).

To establish an adverse action at the prima facie stage, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which…means it might well have dissuaded a reasonable worker from making or supporting a charge of

discrimination." See *Burlington* N. 548 U.S. 53, 68 (2006).   Such actions in the retaliation context

can even include, but are not limited to reprimands, see  *Breaux v. City of Garlan*d, 205 F.3d 150,

157 (5th Cir. 2000); events that lead to a dimunition in prestige, see  *Stewart v. Miss. Transp.*

*Comm'n*, 586 F.3d 321, 332 (5th Cir. 2009)); and decisions impacting an employee's leave, the

denial of paid leave, the denial of an extension of unpaid leave, or the manner of how leave is

taken all constitute an adverse action. See *Mota v. Univ. of Tex. Hous. Health Sci Ctr*., 261 F.3d

512, 521-23 (5th Cir. 2001).

Here, Plaintiff clearly presented evidence of protected activity and its frankly hardly to

imagine why Defendants' intimate that Plaintiff failed to do so.  Defendants acknowledge that it

was on notice of at least a few examples of protected activity referenced in Plaintiff's complaint

in that Plaintiff complained to the defendants about a "plague of discriminatory conduct; that he

provided notice of the inequities to Defendants regarding their acts of racial discriminatory conduct

that are utilized to quiet African-American teachers through real and perceived threats to their

livelihood; that in September 2015 he complained to Turner that the district's hiring practices were

discriminatory"… (Doc. 42 at 25).  Although Defendants contend that Plaintiffs have an absence

of evidence on these points, they failed to point to anything in the record to support this position.

Instead, Defendants offer this Court a self-serving conclusion that when Plaintiff was asked about

allegations in his Complaint, he failed to substantiate the allegations.[5]  Aside from Defendants'

assertion, the record evidence noted in Plaintiff's statement of fact section clearly supports

Plaintiff's retaliation case.  (See SOF).

---

[5] Plaintiff has no idea what question Defendants are referencing, and there is no record citation provided to illustrate
the point which makes it difficult to adequately respond.  For example, Defendants' Counsel asked "was it that
meeting where you said you intended to expose the defendant's discriminatory treatment of minorities?  Plaintiff
replied Yes.. (doc. 41-2-30). This predated many of the subsequent events described as events that would dissuade a
reasonable employee form supporting a charge of discrimination.  This vague question that avoided the heart of the
issue is not a basis for summary judgment whether it was intentional or inadvertent.

23

Beyond the aforementioned record evidence already presented, there is additional evidence that Fairburn clearly had a problem with those who opposed the district's discriminatory practices. Plaintiff was a participant in Rise, an organization that was created by the community to combat the district's discrimination against African-Americans (41-2-36). The organization engaged in speech opposing the racial discrimination of LCSD with respect to African-American teachers and students. (Ex. 1). Fairburn kept a list of those participants. (Ex. 1). Specifically, administrators such as Oakes were directed by Fairburn to intimidate members of the civil rights organization "Rise" who organized to combat the district's discriminatory practices by, amongst other things, taking pictures of those who were protesting the racial discrimination of LCSD at school board meetings, and that Plaintiff expressed to Fairburn related issues concerning the same (doc. 41-2-31). As mentioned, just after one of the days of his testimony in the due process hearings which spanned from February to April 2016, whereby Plaintiff presented clear irrefutable evidence that Fairburn had been lying about the fact the ipad was a personal ipad of Plaintiff, she sent her subordinate to stalk Plaintiff home with the following directive "Ms. Fairburn told me that if you don't have the ipad on you, you need to get in your car. I'm going to follow you to your house. We are going to out of the car, and I'm going to walk to your front door. And you better go get that ipad and bring it back to me or else." (41-2-33). Moreover, he opposed the discriminatory treatment of his son after complaining that his nephew that he raised was subjected to sitting in a segregated classroom in Mrs. Green's classroom, punished by Mrs. Green for being tardy though a Caucasian kid was given a pass, and had his FERPA information disseminated by a Caucasian teacher though it was admitted by Turner as a violation of ethics with no punishment. (41-2-37-38).

In this case, Plaintiff was singled out for reprimands, disciplined for minor infractions, subjected to sham investigations as well as litany of other retaliatory conduct referenced elsewhere

in Plaintiff's response.  Close timing between an employee's protected activity and the adverse action are enough to establish a causal connection required to make out a prima facie case of retaliation." *Heggemeir v. Caldwell Cnty.*, 826 F.3d 861, 870 (5th Cir. 2016)(per curiam). Plaintiffs point to temporal proximity between Plaintiff's protected activity and Defendants' response, in combination with his evidence calling in to question the legitimacy of Fairburn's investigation, the adverse compensatory terms directed by Fairburn, Fairburn's threats to fire Plaintiff if he didn't stay quiet, Fairburn's threats to escalate the matter to impact his future employment prospects, and Fairburn's retaliatory conduct directed towards his wife.  Defendants failed to admit to this Court that a reasonable employee would not have been dissuaded to engage in the aforementioned protectivity.  In deposition, Plaintiff was asked about examples of other African-Americans who encountered the tandem of Fairburn and Oakes due to their race and opposition to district practices (41-2-34-37) and all suffered adverse employment actions.[6] This clearly raises a factual question as to whether but for Plaintiff's complaints, he would not have been forced to endure treatment that would have undoubtedly dissuaded a reasonable worker in Plaintiff's circumstances from making or supporting a charge of discrimination.

Plaintiff's reiterate its previous response regarding Defendants' proffered justifications as pretext for retaliation.  Ultimately, whether an employer's actions are retaliatory often presents a jury question.  See *Burlington N. & Sante Fe Ry. V. White*, 548 U.S. at 71-73 (2006).  To be sure, this Court should find that Plaintiff has shown that fa genuine issue of material fact exists with respect to Plaintiff's retaliation claim.

---

[6] Defendants' Counsel made no attempt to clarify his remarks rather she simply concluded "all right, let me see if I can move along.." ((41-2-37).

E.      Brookins presents a triable issue regarding 1981 Individual Discrimination &
        Municipal Liability

The Court should reject Defendants' defense of Plaintiff's Section 1981 claim.  In order

to succeed, the Plaintiff must show "1) that he is a racial minority; (2) that the defendant intended

to discriminate against him on the basis of race; and (3). that the discrimination concerns one or

more of the activities enumerated in the statute." *Wesley v. Gen. Drivers. Warehousemen &*

*Helpers Local* 745, 660 F.3d 211, 213 (5th Cir 2011).  The relevant portion of the statute requires

that all persons shall have the same right to make, enforce, perform, and terminate contracts as

well as the enjoyment of all benefits, privileges, terms, and conditions of the contractual

relationship.  42 U.S.C. § 1981(b).

Section 1983 "provides a federal cause of action for the deprivation, under color of law, of

a citizen's `rights, privileges, or immunities secured by the Constitution and laws' of the United

States" and "afford[s] redress for violations of federal statutes, as well as of constitutional

norms." *Livadas v. Bradshaw,* 512 U.S. 107, 132 (1994); *Baker v. McCollan,* 443 U.S. 137, 146

(1979) ("Section 1983 imposes liability for violations of rights protected by the Constitution, not

for violations of duties of care arising out of tort law.").  Under § 1983, a municipality or local

government entity, such as an independent school district, may be held liable when a plaintiff

shows three elements: "(1) an official policy (or custom), of which (2) a policymaker can be

charged with actual or constructive knowledge, and (3) a constitutional violation whose `moving

force' is that policy or custom." *Valle v. City of Houston,* 613 F.3d 536, 541-42 (5th Cir.

2010) (quoting *Pineda v. City of Houston,* 291 F.3d 325, 328 (5th Cir. 2002)) (some internal

quotation marks omitted).  Section 1983 may be based on a persistent widespread practice of the

local government officials or employees that is so common and well settled as to constitute a

custom that fairly represents its policy.  *Jett v. Dall. Indep. Sch. Dist.*, 798 F.2d 748, 759 (5th Cir.

1986).  A policy or custom is official only when it results from the decision or acquiescence of the municipal officer or body with final policymaking authority over the subject matter of the offending policy. Id

Although municipal liability cannot be established through *respondeat superior,* the Supreme Court recognized the ratification theory of municipal liability in *City of St. Louis v. Praprotnik,* 485 U.S. 112, 128 (1988). *Khansari v. City of Houston,* 14 F. Supp. 3d 842, 871 (S.D. Tex. 2014). As the Supreme Court explained: When a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.  *Praprtonki,* 485 U.S. at 128.

In Mississippi, a school district's board is the official policy maker with respect to employment decisions, but "if, however, the board…delegated its policymaking authority in the area of at-will employment to [the superintendent], it may be liable for the superintendent's decisions.  *Beattie v. Madison County School Dist*., 254 F.3d 595, 601-602  (5th Cir. 2001).  A single decision by an authorized policy maker may represent an act of official government policy. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-481 (1986).

The district defends against the 1981 charge on the basis of that there is no evidence LCSD as a policy maker should be liable and it reiterated its previous arguments that it did not discriminate.  Plaintiffs rely on their earlier response that it did discriminate.  Furthermore, the district does not deny any of Plaintiff's allegations that Turner and Fairburn were final policy makers with regard to the discriminatory, and retaliatory actions levied against Plaintiff and referenced in his Complaint.  (ECF 1; Ex 1; Ex 2).  Defendants also failed to dispute that the district ratified Defendants' conduct, were aware of the pervasive discriminatory conduct, were

deliberately indifferent to the same, were provided repeated notices of lawsuits or complaints alleging discriminatory and retaliatory conduct, failed to take any actions to rectify these problems, and ratified such conduct. Ex 1; Ex 2.  Instead, the district relies on one perfunctory argument of an isolated incident concerning the school suspension as opposed to final policymaking authority over the subject matter of the offending policy.  Id.  Just as importantly, Defendants conceded to Plaintiff's allegations that the board ratified, and acquiesced to the custom of discriminatory practices of Fairburn and Turner.[7]  As such, Defendant's motion should be denied.

Defendants contend that Fairburn and Plaintiff are entitled to qualified immunity because "there is no evidence that Turner or Fairburn discriminated against him in violation of Section 1981 or that their conduct in recommending a suspension was objectively unreasonable based on the Ipad investigation.   Plaintiffs rely on their previous response that such suspension was pretextual, and expands beyond the Ipad incident.  The law in the Circuit is clear in that racial discrimination, and retaliation for protected activity of the sort described are violations of a clearly established constitutional right.  Based on the record evidence, a reasonable jury could find that Defendants' actions were both objectively unreasonable and in violation of clearly established constitutional rights; thus Defendants' motion should be denied.

F.      Brookins presents a triable fact dispute regarding First Amendment retaliation

The Court should flatly reject Defendants' motion to dismiss Plaintiff's First Amendment retaliation claim.  To state a claim of First Amendment retaliation under Section 1983, Plaintiff must allege facts that demonstrate: "(1) he suffered an adverse employment action; (2) he spoke

---

[7] Plaintiff's agree with the legal standard for qualified immunity although Defendants' relied on a "reasonable officer."

as a citizen on a matter of public concern; (3) his interest in the speech outweighs the government's interest in the efficient provision of public services; and (4) the speech precipitated the adverse employment action." *Anderson v. Valdez,* 845 F.3d 580, 590 (5th Cir. 2016). Defendants agree with the standard, but inexplicably move to dismiss the claim on the basis that after Plaintiff provided adequately provided notice of this claim in his Complaint, Defendants' don't have enough information regarding when he spoke to the defendants, where he did so, and the content of the speech. In other words, Defendants again rely on this motion as a discovery device. Aside from that fact, Defendants own motion references its awareness of the timing of certain of Plaintiff's protected speech including the fact Plaintiff provided evidence that he complained, *inter alia*, to Defendants' Turner and Fairburn about racial discrimination against African-American teachers and their refusal to comply with a federal consent decree, as well as the subsequent charges of discrimination by Brookins. (Ex. 1).

Still, Defendants take the same approach with expect to causation and relied upon Fairburn's affidavit that she would have suspended Plaintiff irrespective of any protective speech by Plaintiff. However, motive and intent are proved only "through circumstantial evidence; determinations regarding motivation and intent depend on complicated inferences from the evidence…within the province of the factfinder.")(quoting *Thornborough v. Columbus & Greenville R. Co*., 760 F.2d 633, 641 (5th Cir. 1985)). Defendants' arguments are flawed for additional reasons. Defendants contend that their subsequent retaliatory conduct is limited to the suspension. But the case law suggest otherwise. "A plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which…means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." See *Burlington* N. 548 U.S. 53, 68 (2006). Such actions in the retaliation context can even include reprimands, see *Breaux v. City of Garlan*d, 205 F.3d 150, 157 (5th Cir. 2000); events that lead to

a dimunition in prestige, see *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 332 (5th Cir. 2009)); and decisions impacting an employee's leave, the denial of paid leave, the denial of an extension of unpaid leave, or the manner of how leave is taken all constitute an adverse action. See *Mota v. Univ. of Tex. Hous. Health Sci Ctr*., 261 F.3d 512, 521-23 (5th Cir. 2001).

Close timing between an employee's protected activity and the adverse action are enough to establish a causal connection required to make out a prima facie case of retaliation." *Heggemeir v. Caldwell Cnty*., 826 F.3d 861, 870 (5th Cir. 2016)(per curiam). Here, the timing was sufficiently close.  After engaging speaking on matters of public concern such as that in September 2015, it led to immediate repercussions for Plaintiff.  (Ex. 1; SOF). This occurred after the aforementioned meeting with Turner and Fairburn prior to the due process hearing as well as the events during the hearing. Id.  Ultimately, whether an employer's actions are retaliatory often presents a jury question.  See *Burlington N. & Sante Fe Ry. V. White*, 548 U.S. at 71-73 (2006).  The Court find that a genuine issue of material fact exists with respect to Plaintiff's First Amendment retaliation claim.

Defendants also argue that they are entitled to qualified immunity because this Circuit only recently clarified that nonfinal policy makers could be liable for first amendment retaliation in an individual capacity.  However, Plaintiffs clearly alleged that Defendants engaged in retaliatory conduct in a policy making capacity with regard to their respective roles.  Moreover, the record evidence establishes that the board was also aware of the pattern, practice, and custom of the discriminatory and retaliatory conduct that was the moving force behind the constitutional violations in this suit and even ratified and delegated its authority to engage in this conduct. (SOF).

   G.    Breach of Contract

In Mississippi, the elements of a breach of contract claim are: "(1) the existence of a valid

contract and (2) breach by the defendant." *Smith v. Antler Insanity, LLC*, 58 F.Supp.3d 716, 723 (S.D. Miss. 2014). Here, Plaintiffs alleged that he had a valid contract with LCSD to serve as teacher of a high school within the district. His constructive discharge, if true, would breach that contract. And this requires resolution by a fact finder. Furthermore, there is record evidence that creates a triable fact dispute as to whether Plaintiff was bullied and discriminated against in violation of explicit rights pursuant to his contract.

  H.  Defamation

  The required elements of a claim for defamation in Mississippi are: "(1) a false and defamatory statement concerning plaintiff; (2) unprivileged publication to third party; (3) fault amounting at least to negligence on part of publisher; (4) and either actionability of statement irrespective of special harm or existence of special harm caused by publication." *Franklin v. Thompson,* 722 So.2d 688, 692 (Miss.1998). "The Mississippi Supreme Court has held that `truth is a complete defense to an action for libel.' `In defamation actions, then, the threshold question ... is whether the published statements are false.' The plaintiff has the burden of proving the falsity of the statement." *Neilson v. Dawson*, 155 So.3d 920, 923 (Miss.Ct.Ap..2014)(quoting *Blake v. Gannett Co.,* 529 So.2d 595, 602 (Miss.1988)) (internal citations omitted).

  Here, a reasonable jury could find that Fairburn maliciously alleged in writing that Plaintiff showed obscene and inappropriate material to minors, failed to supervise minors, and intimidated minors knowing this was not true. This was presented at the due process hearing. Based on the allegations the publication alone caused special harm; thus Defendants' motion should be denied as to this claim as well.

<u>CONCLUSION</u>

Based on the arguments presented and evidence provided, this Court should deny

Defendants' motion for summary judgment.


Respectfully submitted this the 19th day of February, 2019.

<u>/s/ Volney Brand</u>
Volney Brand (Texas Bar No 24073253)
Brand Law PLLC
3626 N Hall Ste 610
Dallas, TX 75219
Telephone: 214-932-1472
Fax: 214-932-1473